**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

JASON ABDUS-SABUR,            )

                                  )

           Plaintiff,           )

                                  )

         v.                 )       Civil Action No. 16-156 (RBW)

                                  )

HOPE VILLAGE, INC., <u>et al.</u>,     )

                                  )

           Defendants.      )

_____)

### MEMORANDUM OPINION

The plaintiff, Jason Abdus-Sabur, "an individual who lacks any functionality in his lower extremities[,] has limited use of his upper extremities, [and] is confined to a wheelchair," First Amended Complaint ("Compl.") ¶ 1, brought this action against the defendants, Hope Village, Inc. ("Hope Village"), the Corrections Corporation of America ("CCA"), and the District of Columbia (the "District"), asserting violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–34 (2012), the Rehabilitation Act of 1973, 29 U.S.C. § 794 (2012), the Fair Housing Act, 42 U.S.C. § 3601, and the District of Columbia's Human Rights Act ("Human Rights Act"), D.C. Code § 2-1401.01 (2015), <u>id.</u> ¶ 3.  Currently pending before the Court are Defendant Corrections Corporation of America's Motion to Dismiss Plaintiff's First Amended Complaint ("CCA's Mot."), ECF No. 22, and Defendant Hope Village's Motion to Dismiss First Amended Complaint ("Hope Village's Mot."), ECF No. 24, both seeking dismissal of the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). Upon careful consideration of the parties' submissions, and for the reasons that follow, the Court will grant both the CCA's and Hope Village's motions to dismiss the plaintiff's claims against

them.[1]

# I.     BACKGROUND

The following factual background is asserted in the plaintiff's First Amended Complaint. In 2011, the plaintiff, "a quadriplegic who requires a wheelchair to move and live as independently as possible," Compl. ¶ 12, was sentenced "to a prison term of seventy (70) months for a non-violent offense," and was placed in two Federal Bureau of Prisons ("BOP") "facilities, first in Rochester, Minnesota, and later in Springfield, Missouri," id. ¶ 13.  When the plaintiff "became eligible for pre-release placement in a halfway house" in 2014, "he requested such a placement . . . because he desired to live in a residential neighborhood, where he could adjust to living with a disability outside of the institutional context, learn to do everyday activities for himself, and secure a job as well as housing."  Id. ¶ 16. "In or prior to August 2014, the BOP referred [the plaintiff] for pre-release placement at Hope Village, a halfway house in the District of Columbia," id. ¶ 17, that is "a privately-owned corporation that contracts with" the BOP, id. ¶ 18, "for the last several months of [the plaintiff's] prison term," id. ¶ 17.  Hope Village accepted the plaintiff for a five month residency.  See id. ¶¶ 1, 17.

"Upon his arrival at Hope Village, [the plaintiff] was assigned to live in one of the apartment units . . . that was designed to be accessible for people who use wheelchairs."  Id. ¶ 27. However, the shower in the plaintiff's apartment unit

> had an architectural barrier [that] restrict[ed] the plaintiff's] access to the shower and creat[ed] a substantial risk of injury.  That is, the threshold to the shower had a lip or a short stair-like barrier that precluded [the plaintiff] from maneuvering his wheelchair into the shower so that he could transfer safely from his wheel

---

[1] In addition to the filings already identified, the Court considered the following submissions in reaching its decision: (1) the plaintiff's Points and Authorities Opposing Motion to Dismiss of Corrections Corporation of America ("Pl.'s CCA Opp'n"); (2) Defendant Corrections Corporation of America's Reply in Support of its Motion to Dismiss ("CCA's Reply"); (3) the plaintiff's Points and Authorities Opposing Hope Village Motion to Dismiss ("Pl.'s Hope Village Opp'n"); and (4) Defendant Hope Village's Reply to Plaintiff's Opposition to Motion to Dismiss First Amended Complaint ("Hope Village's Reply").

chair to the shower bench.

Id.  Because of this architectural barrier, the plaintiff "fell on two occasions while transferring from the shower of his residential unit back into his wheelchair, and required medical treatment for the injuries he suffered."  Id. ¶ 28.  On September 5, 2014, the plaintiff was transferred to the Correctional Treatment Facility in the southeast quadrant of the District of Columbia, where he remained "until January 30, 2015, when he was discharged from custody."  Id. ¶ 29.

While at the Correctional Treatment Facility, the plaintiff "was forced to utilize unsafe shower and toilet facilities [and] fell on approximately sixteen (16) separate occasions . . . while trying to either use the restroom or take a shower."  Id. ¶ 36.  "After several of his falls, [the plaintiff] told . . . [the Correctional Treatment Facility] that he would be able to shower more safely if the facility had better equipment, such as a waterproof wheelchair . . . ."  Id. ¶ 42.  The Correctional Treatment Facility did not provide the requested "reasonable accommodations so that [the plaintiff] would not continue to suffer physical injuries and humiliation."  Id. ¶ 43.

On January 29, 2016, the plaintiff filed a Complaint against Hope Village, the CCA, and the District of Columbia Department of Corrections, alleging disability discrimination in violation of the ADA, the Rehabilitation Act, the Fair Housing Act, and the Human Rights Act. Id. ¶¶ 1, 4.  On March 2, 2016, each of the defendants moved to dismiss the plaintiff's original complaint pursuant to Rule 12(b)(6).  See generally Defendant Hope Village's Motion to Dismiss Complaint (Mar. 2, 2016), ECF No. 16; Defendant Corrections Corporation of America's Motion to Dismiss (Mar. 2, 2016), ECF No. 13; Defendant Department of Corrections' Motion to Dismiss (Mar. 2, 2016), ECF No. 12.  In response, on March 21, 2016, the plaintiff amended his Complaint to include additional allegations against defendants CCA and Hope Village, to remove the District of Columbia Department of Corrections as a named

defendant, and to assert claims against the District.[2]  Defendants Hope Village and the CCA now move again to dismiss the plaintiff's First Amended Complaint pursuant to Rule 12(b)(6).

## II.       STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) tests whether the complaint properly "state[s] a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Rule 8(a) requires only that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  But although "detailed factual allegations" are not required, Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)), a plaintiff must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," id.  Rather, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged."  Id.  A complaint alleging "facts [which] are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility of entitlement to relief.'"  Id. (quoting Twombly, 550 U.S. at 557).

"In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'"  Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)).  However, conclusory allegations are not

---

[2] Because the plaintiff timely amended his complaint, and because Hope Village and the CCA filed separate motions to dismiss the plaintiff's First Amended Complaint, the Court will deny Hope Village's and CCA's motions to dismiss the plaintiff's original complaint as moot.  Additionally, because the plaintiff withdrew his claims against the Department of Corrections by removing the Department as a named defendant in his First Amended Complaint, the Court will also deny as moot the Department of Corrections' Motion to Dismiss.

entitled to an assumption of truth, and even those allegations pleaded with factual support need only be accepted insofar as "they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679.

## III.    ANALYSIS

In moving to dismiss the plaintiff's First Amended Complaint, defendant CCA argues that the plaintiff's ADA, Rehabilitation Act, and Human Rights Act claims against it should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted. CCA's Mot. at 1.  Likewise, defendant Hope Village asserts that the plaintiff's Rehabilitation Act, Fair Housing Act, and Human Rights Act claims against it should also be dismissed for the same reason.  Hope Village's Mot. at 1.  The Court will address each of the defendants' arguments in turn.

### A.  The Plaintiff's Claims Against the CCA

#### 1.  The ADA Claim

The plaintiff predicates his ADA claim against defendant CCA on Title II of the ADA, which prohibits discrimination on the basis of disability by any "public entity."  See Compl. ¶ 78; see also 42 U.S.C. § 12132 (providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity").  Defendant CCA contends that the plaintiff's ADA claim "must be dismissed as a matter of law" because it "is not a public entity" under Title II.  CCA's Mot. at 4.

"To state a claim under Title II [of the ADA] a plaintiff must allege: (1) that he is a 'qualified individual with a disability'; (2) who 'was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise

discriminated against by the public entity'; and (3) that 'such exclusion, denial of benefits, or discrimination was by reason of his disability.'"  <u>Lee v. Corr. Corp. of Am./Corr. Treatment Facility</u>, 61 F. Supp. 3d 139, 142–43 (D.D.C. 2014) (quoting <u>Alston v. District of Columbia</u>, 561 F. Supp. 2d 29, 37 (D.D.C. 2008)).  In relevant part, the ADA defines "public entity" as "any State or local government," and "any department, agency, special purpose district, or other instrumentality of a State or States or local government."  42 U.S.C. § 12131(1)(A), (B).  And, Title II "applies to public entities that are responsible for the operation or management of adult and juvenile justice jails, detention and correctional facilities, and community correctional facilities, either directly or through contractual, licensing, or other arrangements with public or private entities, in whole or in part, including private correctional facilities."  <u>Lee</u>, 61 F. Supp. 3d at 143 (quoting 28 C.F.R. § 35.152(a) (2015)).

Here, the plaintiff fails to state a claim under Title II of the ADA because "[a]s a private prison company, defendant [CCA] is not covered by Title II of the ADA."  <u>Id.</u>  In <u>Lee</u>, another member of this Court dismissed a plaintiff's ADA claim also against the CCA because the ADA "provides no indication that a private company is a 'public entity' for the purposes of Title II," and "while Title II of the ADA covers discrimination taking place in prisons, private prison companies are not directly liable for such violations."  <u>Id.</u> (citations omitted) (footnote omitted) (collecting cases) ("A private contractor does not . . . become liable under Title II merely by contracting with the State to provide governmental services, essential or otherwise." (quoting <u>Edison v. Douberly</u>, 604 F.3d 1307, 1310 (11th Cir. 2010))).  This member of the Court agrees, and therefore, reaches the same conclusion as the Court in <u>Lee</u>.  "Because the plaintiff [in this case] fails to allege that he was 'excluded from participation in or . . . denied the benefits of the services, programs, or activities of a <u>public entity</u>, or . . . subjected to discrimination by any such

entity,' the Court will dismiss his ADA claim" against defendant CCA.  Id. at 144 (alteration in original) (citation omitted).

### 2.  The Rehabilitation Act Claim

Count VII of the First Amended Complaint alleges that defendant CCA violated section 504 of the Rehabilitation Act, see Compl. ¶ 73, which provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," 29 U.S.C. § 794(a).  "Because [the p]laintiff has not alleged facts which plausibly demonstrate that [it] receives federal financial assistance . . . ," defendant CCA asserts that the plaintiff's Rehabilitation Act claim against it "must [also] be dismissed as a matter law."  CCA's Mot. at 6.

The scope of section 504 of the Rehabilitation Act is limited "to those who actually 'receive' federal financial assistance because [Congress] sought to impose [section] 504 coverage as a form of contractual costs of the recipient's agreement to accept the federal funds." U.S. Dep't of Transp. v. Paralyzed Veterans of Am., 477 U.S. 597, 605 (1986).  "Courts interpreting [section] 504 of the Rehabilitation Act have consistently construed 'Federal financial assistance' to mean the federal government's provision of a subsidy to an entity, not the federal government's compensation of an entity for services provided."  Lee, 61 F. Supp. 3d at 144 (citing Nolley v. Cty. of Erie, 776 F. Supp. 715, 742–43 (W.D.N.Y. 1991)).  And, "courts should look to whether the federal entity providing the alleged assistance intended 'to provide assistance or merely to compensate.'"  Hunter ex rel. A.H. v. District of Columbia, 64 F. Supp. 3d 158, 172 (D.D.C. 2014) (citations omitted).

The plaintiff alleges that defendant "CCA benefits from a number of government

subsidies, including, but not limited to, Medicare and/or Medicaid payments, tax concessions, and federal, state, or local grants."  Compl. ¶ 10; see also id. ¶ 74 ("CCA receives federal financial assistance in the form of Medicare and Medicaid payments that subsidize the treatment of covered individuals at the facility [and] also receives federal financial assistance to operate [the Correctional Treatment Facility] . . . .").  However, "Medicare does not pay for medical items and services furnished to beneficiaries who are incarcerated or in custody," CCA's Mot. at 5 (citing Dep't of Health & Human Servs., Medicare Coverage of Items and Services Furnished to Beneficiaries in Custody Under a Penal Authority 2 (2016) ("Medicare will generally not pay for medical items and services furnished to a beneficiary who is incarcerated or in custody under a penal statute or rule at the time the items and services are furnished.")), and "Medicaid does not pay for medical care for inmates," id. at 6 (citing Health Coverage for Incarcerated People, HealthCare.gov, https://www.healthcare.gov/incarcerated-people/ (last visited Nov. 10, 2016) ("Medicaid won't pay for your medical care while you're in prison or jail.")).[3]  And while the plaintiff disputes defendant CCA's claim that it does not receive Medicare and Medicaid payments, see Pl.'s CCA Opp'n at 7 (failing to address the authority proffered by defendant CCA and citing only to a Florida Office of the Attorney General Medicaid Fraud Control Unit Investigation Report providing that, in 2005, CCA paid $298,115 to settle claims that it improperly billed Medicaid for outside medical services provided to inmates in Florida), as defendant CCA notes,

> even if Medicare or Medicaid payments were somehow improperly made to

---

[3] "In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice."  Abhe & Svoboda, Inc. v. Chao, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (citation omitted).  And, "public records and government documents available from reliable sources," Detroit Int'l Bridge Co. v. Gov't of Canada, 133 F. Supp. 3d 70, 85 (D.D.C. 2015) (citing Hamilton v. Paulson, 542 F. Supp. 2d 37, 52 n.15 (D.D.C. 2008), rev'd on other grounds, 666 F.3d 1344 (D.C. Cir. 2012)), are "among the documents 'subject to juidicial notice on a motion to dismiss,'" Latson v. Holder, 82 F. Supp. 3d 377, 382 (D.D.C. 2015).  Therefore, the Court takes judicial notice of these two governmental documents.

> inmates incarcerated at [the Correctional Treatment Facility], such payments
> would not be made to CCA, which does not provide medical care or services of
> any kind to inmates at [the Correctional Treatment Facility], but would instead go
> to Unity Healthcare, which provides all medical care and services to inmates at
> [the Correctional Treatment Facility] pursuant to a separate contract between
> Unity and the District,

CCA's Mot. at 6 (citing The Performance of Unity Healthcare, Inc. in the District of Columbia Jail: Joint Hearing Before the Council of the District, Comm. on Health, Comm. on Pub. Safety & the Judiciary (2007) (statement of Devon Brown, Director of D.C. Dep't of Corrections) ("In October 2006, the Department of Corrections [entered into] a newly formed partnership with Unity Healthcare, Inc., . . . [which] became the sole provider of an extensive and comprehensive healthcare continuum for the District's inmates, which includes primary, specialty, emergency and hospital care.")).

Furthermore, although defendant CCA "receives federal funds to incarcerate BOP and [United States Marshals Service] inmates at [the Correctional Treatment Facility]" through its contracts with these agencies, CCA's Mot. at 5, it "does not receive 'Federal financial assistance' within the meaning of the Rehabilitation Act," as such federal funds are intended to compensate defendant CCA for its services and not to subsidize defendant CCA, Lee, 61 F. Supp. 3d at 144. Additionally, as the Court previously noted, the scope of section 504 is limited to "any program or activity receiving Federal financial assistance," 28 U.S.C. § 794(a), in the form of a subsidy and not merely a benefactor of federal funding, which is what the plaintiff here alleges. Accordingly, because the plaintiff's "[t]hreadbare recital[] of the elements of a cause of action [under section 504] . . . [and] mere conclusory statements," Iqbal, 556 U.S. at 678, that defendant CCA receives and benefits from federal financial assistance do not plausibly give rise to an entitlement to relief, the Court must dismiss the plaintiff's Rehabilitation Act claim against defendant CCA.

### 3.   The District of Columbia Human Rights Act Claims

The plaintiff asserts that defendant CCA, which "operates [the Correctional Treatment Facility] under a contract with [the] District . . . , violated [section 2-1402.67 of] the . . . Human Rights Act . . . by obtaining a permit, license, franchise, benefit, exemption, or advantage from [the] government of the District . . . and failing to fully comply with the provisions of the . . . Human Rights Act." Compl. ¶ 82.  In response, defendant CCA argues that the plaintiff's Human Rights Act claim against it must be dismissed because the "plaintiff does not allege any facts showing that [s]ection 2-1402.67 can be enforced against [it]," since it is "a private entity." CCA's Mot. at 7.  According to defendant CCA, "the plain language of [s]ection 2-1402.67 . . . compels the conclusion that an action to enforce its terms would lie, if at all, against the District rather than against [d]efendant CCA." Id.; see also CCA's Reply at 4–5.

Section 2-1402.67 of the Human Rights Act provides,

> All permits, licenses, franchises, benefits, exemptions, or advantages issued by or on behalf of the government of the District . . . , shall specifically require and be conditioned upon full compliance with the provisions of this chapter; and shall further specify that the failure or refusal to comply with any provision of this chapter shall be a proper basis for revocation of such permit, license, franchise, benefit, exemption, or advantage.

D.C. Code § 2-1402.67.

Whether an action under section 2-1402.67 may be enforced against a private entity appears to be a question of first impression in this Circuit, as the Court has been unable to identify other cases that address this question.  Nonetheless, the Court finds the language of section 2-1402.67 to be "plain and unambiguous" and thus, the Court's "analysis ends with the text." Chao v. Day, 436 F.3d 234, 235 (D.C. Cir. 2006); see also United States ex rel. Totten v. Bombardier Corp., 380 F.3d 488, 494 (D.C. Cir. 2004) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—

is to enforce it according to its terms." (quoting Lamie v. U.S. Tr., 540 U.S. 526, 534 (2004))).

As defendant CCA has noted, the plain language of section 2-1402.67 does not suggest that an

action brought pursuant to this section may be enforced against a private entity.  Rather, the

statute's plain language suggests that an action based on section 2-1402.67 would be enforceable

only against the District, as the District has both "a mandatory duty" to incorporate provisions

"in any particular contract that require[] compliance with the [Human Rights Act]" and also a

"mandatory obligation, not a discretionary ability to enforce" such provisions in the contract.

Hunter ex rel. A.H., 64 F. Supp. 3d at 182–83.  Moreover, as the District has the sole authority to

issue the "permit[], license[], franchise[], benefit[], exemption[], or advantage[]," the contractual

right to "revo[ke] [ ] such permit, license, franchise, benefit, exemption, or advantage" if the

recipient "fail[s] or refus[es] to comply with [the Human Rights Act]," section 2-1402.67,

remains with the District.  And, although the "[p]laintiff contends that the expansive language of

[section] 2-1402.67 allows enforcement of the [Human Rights Act] against recipients of licenses,

permits, benefits and advantages from the District," Pl.'s CCA Opp'n at 8, he fails to cite any

legal authority that supports this proposition or the proposition that the language of section

2-1402.67 should be read as broadly as the plaintiff contends.  Accordingly, assuming that

section 2-1402.67 created a private cause of action, because the plain language of section

2-1402.67 would require that an action based on this section be brought against the District and

not a private entity, the Court will dismiss the plaintiff's section 2-1402.67 claim against

defendant CCA.

### B.  The Plaintiff's Claims Against Hope Village

#### 1.  The Rehabilitation Act Claim

Similar to Count VII, Count I of the First Amended Complaint alleges that defendant

Hope Village violated section 504 of the Rehabilitation Act, see Compl. ¶ 49, and like defendant

CCA, defendant Hope Village argues that the plaintiff's Rehabilitation Act claim against it "fails

as a matter of law because he has not and cannot allege, much less prove, that Hope Village

receives federal financial assistance or a subsidy."  Hope Village's Mot. at 3.

As the Court previously noted, section 504 of the Rehabilitation Act is limited "to those

who actually 'receive' federal financial assistance."  Paralyzed Veterans of Am., 477 U.S. at 605.

The plaintiff alleges that Hope Village "receives federal financial assistance and subsidies for

programs and services and augments its programming via direct assistance from BOP staff."

Pl.'s Hope Village Opp'n at 6.  Therefore, the "[p]laintiff contends that Hope Village's motion

raises fact issues not ripe for consideration" because Hope Village's "contracts(s) at issue have

not yet been disclosed, so it is impossible to say (and wholly improper to infer on a Rule 12

motion) that the contracts are pure procurement contracts that do not subsidize any component of

Hope Village's operations, as opposed to paying for services rendered."  Id.; see also Hunter ex

rel. A.H., 64 F. Supp. 3d at 172 (denying motion to dismiss the plaintiffs' Rehabilitation Act

claim against a private homeless shelter because the plaintiffs' allegations that the homeless

shelter "receives federal and District funds for homeless programs, health programs[,] and other

programs and services" and "has received substantial recent federal grants from [the

Departments of Health and Human Services] and [Housing and Urban Development]," in

addition to a Department of Health and Human Services' "regulation specifically noting that

grants of funds are federal financial assistance" was sufficient to state a claim under section 504).

Here, the plaintiff's speculative allegations that defendant Hope Village receives

subsidies in its contracts with the BOP that qualify as federal financial assistance do not state a

facially plausible claim under section 504 of the Rehabilitation Act.  The plaintiff states that

"Hope Village contracts with the BOP to provide halfway house placement and reintergration

services[,]" Pl.'s Hope Village Opp'n at 5, and that he "strongly suspects that discovery would

show [that Hope Village's] contracts include subsidies" because the District of Columbia

Corrections Information Council Report ("Council Report") 13 (May 24, 2013)[4] "noted that the

BOP pays Hope Village approximately $5.5 million annually to house 140 individuals.  The two

contracts have per diem rates between $96.67 and $100.09.  However, the per diem rates

multiplied by the number of beds yields slightly more than $5 million annually," Pl.'s Hope

Village Opp'n at 5 n.2 (citing Council Report at 13).  However, the Council Report notes that the

BOP's contracts with Hope Village "are performance-based contracts."  Council Report at 13.

Thus, a mere calculation of "the per diem rates multiplied by the number of beds" will not equal

the total compensation defendant Hope Village will receive under its contracts, as the total

compensation that it will receive is derived from performing the services it is contractually

obligated to provide.  And the small discrepancy between the additional compensation Hope

Village received pursuant to its contracts and the calculated compensation identified by the

plaintiff does not plausibly suggest that Congress or the District intended to subsidize defendant

Hope Village.  See White v. Bank of America, N.A., __ F. Supp. 3d __, __, No. 12-cv-581

(TSC), 2016 WL 4099043, at *7 n.1 (D.D.C. Aug. 2, 2016) ("[T]he proper test for distinguishing

'Federal Financial assistance' from other payments or transfers is 'whether the defendant has

received a subsidy or gift, or, in other words, a payment or transfer for less than fair market

value'" of the services provided. (internal citation omitted)).

Also, the plaintiff alleges that Hope Village receives federal financial assistance because

"the BOP augments Hope Village's staffing with BOP mental health staff from time to time" and

---

[4] Although this document was not attached to the plaintiff's First Amended Complaint, the Court will also take
judicial notice of this document because it is a public record and a government document available from a reliable
source.  See supra Part III.A.2. at 8 n3.

because Hope Village "has implemented detailed guidelines for the standardized cognitive

behavioral programming [it] is required to offer its residents." Compl. ¶ 9. Yet, the Council

Report relied on by the plaintiff states that

> Hope Village is not contracted to provide medical or mental health services to
> residents. Residents with psychological and/or medical diagnoses are identified
> on the transfer paperwork from the Bureau referring institution. Within the first
> week of arrival at Hope Village, these residents are sent to Unity Health Care for
> an initial medical assessment and then referral for treatment.

Council Report at 32–33 (discussing the various community providers that residents at Hope

Village are reffered to for medical and mental health treatment). And "offer[ing] standardized

cognitive behavior programming required by Department of Justice guidelines," Pl.'s Hope

Village Opp'n at 5, does not conceivably indicate that defendant Hope Village receives a subsidy

qualifying as federal financial assistance for compliance with implementing the required

programming, let alone any additional payment above the compensation it receives for the

services it provides. Accordingly, because the plaintiff's threadbare allegations that defendant

Hope Village receives federal financial assistance beyond its contractual compensation "stop[]

short of the line between possibility and plausibility of entitlement of relief," Iqbal, 556 U.S. at

678 (internal citation and quotation marks omitted), the Court must dismiss the plaintiff's

Rehabilitation Act claim against defendant Hope Village.

### 2. The Fair Housing Act Claims

Counts II and III of the First Amended Complaint assert that defendant Hope Village

violated §§ 3604 (c) and (f)(1), (2), and (3)(B) of the Fair Housing Act. See Compl. ¶¶ 53–63.

Defendant Hope Village contends that dismissal of the plaintiff's Fair Housing Act claims

against it is required because the plaintiff failed to "allege that he was in a landlord-tenant

relationship with Hope Village," Hope Village's Mot. at 5–6, and "because Hope Village is not a

'dwelling' as defined by the Fair Housing Act," id. at 7.

Section 3604(c) makes it unlawful "[t]o make, print, or publish, or cause to be made, printed, or published . . . any . . . statement . . . , with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . handicap . . . , or an intention to make any such preference, limitation, or discrimination."  42 U.S.C. § 3604(c). Additionally, § 3604 (f)(1) and (2) prohibit discrimination either "in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter" or "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap."  § 3604 (f)(1)–(2).  Under § 3604, "discrimination includes . . . a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  § 3604 (f)(3)(B).  Although "[t]he Supreme Court has emphasized that the language of the [Fair Housing Act] is 'broad and inclusive,' and must be given a 'generous construction,'" Hunter ex rel. A. H., 64 F. Supp. 3d at 173 (quoting Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 209 (1972)), the statutory language is clear that "[b]oth sections require that the discrimination occur in connection with the 'sale or rental of a dwelling,'" id. at 176.

The Fair Housing Act defines a "dwelling," in relevant part, as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."  42 U.S.C. § 3602(b).  Although the Fair Housing Act does not define "residence[, m]ost courts that have considered the scope of the term have relied on the definition used in United States v. Hughes Memorial Home, 396 F. Supp. 544 (W.D. Va. 1975), which is 'a temporary or permanent dwelling place, abode or habitation to which one intends to return as

distinguished from the place of temporary sojourn or transient visit.'"  Hunter ex rel. A.H., 64 F.

Supp. 3d at 174 (quoting Hughes Mem'l Home, 396 F. Supp. at 549).

There does not appear to be a case in this Circuit that has addressed whether a halfway

house for incarcerated federal offenders in the District is a "dwelling" for purposes of the Fair

Housing Act.  Although no such guidance exist, the Court concludes that Hope Village,

considered from the perspective of how it operates, is a "temporary . . . dwelling place . . . to

which [residents of Hope Village] intend[] to return," id., and therefore, it is a "dwelling" within

the meaning of the Fair Housing Act.  Defendant Hope Village argues that, as a community

confinement facility, it is akin to a jail, which, under Garcia v. Condarco, 114 F. Supp. 2d 1158,

1163 (D.N.M. 2000), is not a "dwelling" within the meaning of the Fair Housing Act.  Hope

Village's Mot. at 7.  However, "a community corrections facility is not a jail."  United States v.

Jones, 752 F.3d 1039, 1042 (5th Cir. 2014); see also United States v. Voda, 994 F.2d 149, 152

(5th Cir. 1993) (noting that the term "'community corrections facility' appears to refer to

rehabilitations facilities and half-way houses . . . and not jails" based on its placement in the

United States Sentencing Guidelines).  Moreover, although the plaintiff remained in the BOP's

custody and control during his stay at Hope Village and "[h]is freedom of movement was

restricted and monitored," he had authorization to venture "outside the halfway house to access

counseling and/or employment services in the community."  Hope Village's Mot. at 8; see

United States v. Chavez, 204 F.3d 1305, 1315 (11th Cir. 2000) ("We have previously held that

confinement to a halfway house at night with the requirement that a defendant work at a job or

seek employment during the day is a liberty 'markedly different from custodial incarceration in a

penitentiary.'" (citations omitted)).  Therefore, because Hope Village is a residential reentry

center or halfway house that provides "halfway house placement and reintegration services for

16

federal offenders," Compl. ¶ 9; see also id. ¶¶ 20–25 ("Residents at Hope Village are responsible for their own medical care and can travel within the community via public or private transportation for necessary medical care"; "[R]esidents of Hope Village utilize both public and private transportation to attend religious services at their desired houses of worship"; "Residents of Hope Village are permitted to bring personal belongings into Hope Village"; and "When appropriate, residents of Hope Village may stay after the end of their sentence terms in order to avoid homelessness."), the Court concludes that Hope Village is a "dwelling" within the meaning of the Fair Housing Act.

Notwithstanding the Court's finding that Hope Village is a "dwelling" as defined in the Fair Housing Act, the plaintiff has failed to sufficiently allege a claim under § 3604 because the statutory language "seems to limit the scope of unlawful discrimination to the entity buying or renting the dwelling in question." Hunter ex rel. A.H., 64 F. Supp. 3d at 177. In its motion to dismiss, defendant Hope Village argues that § 3604 was "not implicated" because the plaintiff did not "rent[] space at Hope Village" and that dismissal of the plaintiff's Fair Housing Act claims is warranted because the plaintiff "d[id] not allege a landlord-tenant relationship to support" his § 3604 claims. Hope Village's Reply at 5; see also Hope Village's Mot. at 5–6. However, in his opposition to defendant Hope Village's motion to dismiss, the plaintiff failes to address this argument, and therefore, the Court may treat defendant Hope Village's position regarding the plaintiff's Fair Housing Act claims as conceded. See, e.g. Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (Walton, J.) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (citations omitted)), aff'd 98 F. App'x 8 (D.C. Cir.

2004).

Nonetheless, even construing the Fair Housing Act

> as broadly as possible, the clear language of the statute restricts the class of people who can bring a claim under [§] 3604(f)(1) to a 'buyer or renter,' or, at its broadest, individuals who were otherwise denied the opportunity to become a buyer or renter. There is no such allegation that the [plaintiff] fall[s] into either category.

Hunter ex rel. A. H., 64 F. Supp. 3d at 178 (dismissing the plaintiffs' § 3604(f)(1) claim because

they "failed to sufficiently allege that the District or [the federally-funded homeless shelter]

discriminated against them as 'buyers or renters'"); see id. at 177 ("[T]he 'renters' are the federal

agencies that provide funds to [the d]efendants, not the [p]laintiffs."). And the plaintiff is

certainly not a buyer or renter at Hope Village because the individuals who reside at "Hope

Village are offenders with a referral from the BOP[, which] has the authority to place [federal]

inmates at the Hope Village correctional facility." Hope Village's Mot. at 6; see also 18 U.S.C.

§ 3624(c)(1) (2012) ("The Director of the Bureau of Prisons shall, to the extent practicable,

ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that

term (not to exceed [twelve] months), under conditions that will afford that prisoner a reasonable

opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such

conditions may include a community correctional facility."). Accordingly, because the plaintiff

failed to address Hope Village's argument that the plaintiff was not in a "landlord-tenant

relationship" with Hope Village, and because the plaintiff, as a federal inmate when he resided

there, did not fall into the class of either a "buyer or renter" [5] as required under § 3604 of the Fair

---

[5] In Hunter ex rel. A.H., the district court concluded that the plaintiffs stated a claim under § 3604(f)(2) because they "alleged that they were discriminated against in the provision of services or facilities that appropriately accommodated [the plaintiff's daughter's] handicap," and that the homeless shelter "receive[d] consideration for a resident's stay—whether it be from federal or other funding directed to subsidizing the costs of providing housing to the homeless." 64 F. Supp. 3d at 177. Although the plaintiff here alleges that he was discriminated against in the

(continued . . .)

Housing Act, the Court must dismiss the plaintiff's Fair Housing Act claims against defendant Hope Village.

### 3.  The District of Columbia Human Rights Act[6] Claims

#### a.  The Section 2-1402.21(a)(5) and (d) Claims

Counts IV and V of the First Amended Complaint allege that defendant Hope Village violated section 2-1402.21(a)(5) and (d) of the Human Rights Act, see Compl. ¶¶ 64–69, which "makes discrimination associated with the sale or rental of a dwelling unlawful in language that parallels the analogous provision of the [Fair Housing Act]."  Hunter ex rel. A.H., 64 F. Supp. 3d at 178–79.  Defendant Hope Village contends that the plaintiff's claims under section 2-1402.21(a)(5) and (d) likewise fail for the same reasons that his Fair Housing Act claims fail, that is, because Hope Village is not a "dwelling" and the plaintiff has not alleged that he was in a landlord-tenant relationship with Hope Village.  Hope Village's Mot. at 5–7.

"District of Columbia courts interpreting the [Human Rights Act] 'have generally looked [for guidance] to cases from the federal courts' arising under federal civil rights statutes." Whitbeck v. Vital Signs, Inc., 116 F.3d 588, 591 (D. C. Cir. 1997) (alteration in original) (quoting Benefits Commc'n Corp. v. Klieforth, 642 A.2d 1299, 1301–02 (D.C. 1994)); see also Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C., 950 F. Supp. 393, 405 (D.D.C. 1996) ("The D.C. courts have always looked to cases from the federal courts in

---

(. . . continued)
provision of services or facilities at Hope Village, see Compl. ¶ 54, he does not plausibly allege that Hope Village receives subsidies as federal financial assistance, as the Court previously discussed, see supra Part III.B.1. Therefore, the Court will also dismiss the plaintiff's Fair Housing Act claim under § 3604(f)(2) against Hope Village.

[6] In its motion, defendant Hope Village argues that the plaintiff's Human Rights Act claims were untimely filed because the one year statute of limitations for such claims had expired.  See Hope Village's Mot. at 10.  However, in response to plaintiff's opposition to its motion, defendant Hope Village "concede[d] that the [plaintiff's Human Rights Act] claims are timely brought for the purposes of [its] Rule 12(b)(6) motion[,] . . . [but] reserve[d] its right to raise this issue again at the summary judgment stage if any of the claims survive [its] motion [to dismiss] and discovery discloses a basis for raising a statute of limitations challenge."  Hope Village's Reply at 7.  Therefore, the Court will not address the issue of whether the plaintiff's Human Rights Act claims were timely filed at this time.

interpreting the D.C. Human Rights Act, and have followed, wherever applicable, precedents from the federal courts' treatment of comparable civil rights statutes.").  Accordingly, although the Court finds that Hope Village is likewise a "dwelling" under the Human Rights Act, see supra Part III.B.2, the Court must dismiss the plaintiff's section 2-1402.21(a)(5) and (d) Human Rights Act claims because the plaintiff failed to respond to defendant Hope Village's argument that the plaintiff was not in a "landlord-tenant" relationship with Hope Village, and because the plaintiff, as a federal inmate at that time, did not fall into the category of a "buyer or renter" at Hope Village.

### b. The Section 2-1402.31 Claim

Through Count VI, the plaintiff asserts that defendant Hope Village violated section 2-1402.31 of the Human Rights Act by denying him "the full and equal enjoyment of services, facilities, and accommodations of a halfway house that is a place of public accommodation." Compl. ¶ 71; see also D.C. Code § 2-1402.31(a)(1).  Arguing that it "is not a 'place of public accommodation,'" defendant Hope Village contends that "dismissal of Count VI is justified." Hope Village's Mot. at 9.

"Section 2-1401.02(24) of the [Human Rights Act] defines places of public accommodation as 'all places included in the meaning of' a long list of terms."  Hunter ex rel. A.H., 64 F. Supp. 3d at 180 (citing D.C. Code § 2-1401.02(24)).  And, although "[t]he term 'place of public accommodation' is defined 'broadly' under the [Human Rights Act]," Boykin v. Gray, 895 F. Supp. 2d 199, 217 n.16 (D.D.C. 2012) (citing Blodgett v. Univ. Club, 930 A.2d 210, 218 (D.C. 2007)), aff'd, 650 F. App'x 42 (D.C. Cir. 2016), the term does "not include any institution . . . or place of accommodation which is in its nature distinctly private," § 2-1401.02(24).

Hope Village is not a "place of public accommodation" as defined in the Human Rights Act, and therefore, the Court must dismiss the plaintiff's claim under section 2-1402.31.  There does not appear to be a case in this Circuit that addresses whether a halfway house that serves as a reentry center for federal inmates is a place of public accommodation as defined under section 2-1402.02(24).  Even so, to support his position that Hope Village, a halfway house for inmates in the District, is a "place of public accommodation," the plaintiff relies on Hernandez v. County of Monterey, 70 F. Supp. 3d 963 (N.D. Cal. 2014), where the district court in that case concluded that a private operator of medical facilities located in a county jail "operate[d] . . . a place of public accommodation for purposes of Title III" of the ADA.  See id. at 977. However, the plaintiff's reliance on Hernandez is of no avail because the alleged discriminatory acts by the private medical operator allegedly occurred in the county jail, a place that had already been determined to be a "place of public accommodation."  Id. at 978 (citing Wilkins-Jones v. Cty. of Alameda, 859 F. Supp. 2d 1039, 1049 (N.D. Cal. 2012) ("[I]t is reasonable to consider a jail a public place in the context of inmates' rights to be free from discrimination on the basis of their disabilities.  While the general public is not permitted inside a jail at any given time, the government has the power to compel members of the public to a jail under certain circumstances. . . . [A] jail is more like schools and hospitals contemplated under the ADA, which also restrict public access in certain times and circumstances but are nonetheless designed and intended to provide services, goods, privileges, and advantages to members of the public.")).  Here, the alleged discriminatory conduct occurred at a "privately-owned entity . . . known as a halfway house facility," Compl. ¶ 9, located beyond the walls of a government operated detention facility, unlike the situation in Hernandez, see 70 F. Supp. 3d at 977.

Moreover, the Court finds the rationale provided in <u>Vega v. United States</u>, No. C11-632-RSM, 2012 WL 5384735, at *1 (W.D. Wash. Nov. 1, 2012), <u>vacated in part on reconsideration</u>, 2013 WL 1333978, at *1 (W.D. Wash. Apr. 1, 2013), although not binding on the Court, to be particularly instructive.  In <u>Vega</u>, the district court concluded that "[r]esidential reentry centers are notably distinctly private, as absent a criminal sentence, members of the public cannot get accommodation in such facilities."  <u>Vega</u>, 2012 WL 5384735, at *12; <u>see also</u> Hope Village's Reply at 7 ("The facility is not offered for rent to the public, and no one from the general public can come to stay at Hope Village or access any of its services.").  Additionally, "re-entry centers such as [Hope Village] do not as a general course of business provide goods or services to the general public," <u>Vega</u>, 2012 WL 5384735, at *12, and the plaintiff does not allege that Hope Village provides goods or services to the general public, <u>see</u> Compl. ¶ 9 (stating that Hope Village "provide[s] halfway house placement and reintegration services for federal offenders in the District").  Consequently, the Court finds that Hope Village is a private facility not accessible to the general public and therefore not a place of public accommodation.  Accordingly, the Court must dismiss the plaintiff's section 2-1402.31 claim against defendant Hope Village.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court grants defendants CCA's and Hope Village's motions to dismiss the plaintiff's claims against them pursuant to Rule 12(b)(6).

**SO ORDERED** this 22nd day of December, 2016.[7]

REGGIE B. WALTON
United States District Judge

---

[7] An Order consistent with this Memorandum Opinion is issued simultaneously with this opinion.